IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LINDA C. FAIGEN, | ) Civil No.: 3:11-cv-00219-JE |
| | ) |
| Plaintiff, | ) FINDINGS AND |
| | ) RECOMMENDATION |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

       Alan Stuart Graf
       Alan Stuart Graf P.C.
       316 Second Rd
       Summertown, TN 38483

            Attorney for Plaintiff


       S. Amanda Marshall, U.S. Attorney
       Adrian L. Brown, Asst. U.S. Attorney
       1000 S.W. 3rd Avenue, Suite 600
       Portland, OR 97204-2902

David J. Burdett
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Linda Faigen brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying her application for Social Security Disability Insurance Benefits (DIB) under the Social Security Act (the Act).

In his response to Plaintiff's opening memorandum, the Commissioner moves to remand the action to the Social Security Administration (the Agency) for further proceedings. For the reasons set out below, the Commissioner's decision should be reversed and the action should be remanded to the Agency for an award of benefits.

## **Procedural Background**

Plaintiff filed an application for DIB on June 23, 2006, alleging that she had been disabled since June 23, 2006 because of bipolar disorder, post traumatic stress disorder (PTSD), anxiety, agoraphobia, and back problems.. She subsequently amended the date of the alleged onset of her disability to February 7, 2003. Plaintiff's claim was denied initially on September 18, 2006, and was denied upon reconsideration on February 13, 2007.

Pursuant to Plaintiff's timely request, a hearing was held before Administrative Law Judge (ALJ) Riley Atkins on July 1, 2009. Following the hearing, ALJ Atkins referred Plaintiff for an orthopedic examination and a neuropsychological examination. After these evaluations

FINDINGS AND RECOMMENDATION - 2

had been performed, and Plaintiff's counsel had arranged for a separate psychological

evaluation, a supplemental hearing was held before ALJ Atkins on September 9, 2009. Plaintiff

and Patricia Ayerza, a Vocational Expert (VE), testified at that hearing.

In a decision dated September 24, 2009, ALJ Atkins found that Plaintiff was not disabled

within the meaning of the Act. Plaintiff timely requested review by the Appeals Council, and

subsequently sought extensions of the time in which to file an appeal and submit additional

documents while she sought different representation. The Appeals Council initially denied

Plaintiff's request for review on December 10, 2009. After later granting requests for extensions

of time, the Appeals Council denied Plaintiff's request for review a second time on January 7,

2011, rendering the ALJ's decision the final decision of the Commissioner. In the present action

Plaintiff seeks review of that decision.


**Factual Background**

Plaintiff was born on July 24, 1956, and was 53 years old at the time of the ALJ's

decision. She left high school in the 11th grade, and earned a GED in 1974. Plaintiff has past

relevant work as a credit union branch operation manager, a financial institution president, and

an accountant. She has not worked full time since February, 2003. Since then, at times she has

run an online business selling crafts.


**Medical Record**

Plaintiff has been treated for bipolar disorder at least from the late 1990s. Chart notes

from 1999 indicate that Plaintiff was taking Klonopin, Lithium, and Wellbutrin, and that these

drugs helped stabilize Plaintiff's mood. Plaintiff stopped taking Lithium because it made her

hair fall out, and reported that Klonopin caused her to feel "foggy" and affected her work performance.

Plaintiff was hired to manage a credit union in April, 2002. She left that position in February, 2003, and reported that she had quit because the position was too stressful. About that time, she told George Wittkopp, her treating psychiatrist, that she planned to commit suicide when her savings ran out. She also stated that she was drinking a lot of wine, and did not think she could stop. In August, 2003, Plaintiff reported that she was working for a temp agency, and that, except for going to work, she lived in isolation.

On September 10, 2004, Plaintiff told Dr. Wittkopp that she had stopped drinking two months earlier and had experienced many migraine headaches since doing so. She told Dr. Wittkopp that she was living off money from a trust fund. In October, 2004, Plaintiff reported that she was living as a recluse and that her memory had worsened significantly.

In November, 2004, Plaintiff told Dr. Wittkopp that she was experiencing the symptoms of a manic bipolar phase. In December, 2004, Plaintiff reported a 10 day period of hypomania. Dr. Wittkopp tried to convince her to start taking Trileptal as a mood stabilizer. Plaintiff declined. Later that month Plaintiff reported that she was "back down to earth," and that she had not taken mood stabilizing medication because she was "having too much fun."

Dr. David Dine, a neurologist, evaluated Plaintiff on December 14, 2004. Plaintiff told Dr. Dine that she had experienced headaches since she was three years old, and that she had experienced severe headaches monthly during the previous three years. She said that she had experienced daily headaches since she stopped drinking in July, 2004, and reported that she was taking 14 Excedrin tablets a day. Plaintiff also said that she was having problems with memory and concentration. Dr. Dine thought that Plaintiff's headaches were not caused by intracranial

FINDINGS AND RECOMMENDATION - 4

problems, and opined that prophylactic medications were not a feasible option because of the large number of medications that Plaintiff was already taking.  A CT scan that Dr. Dine recommended revealed no abnormalities.

In his summary of a visit on January 25, 2005, Dr. Wittkopp noted that Plaintiff was mildly agitated and might again be experiencing hypomania.  Dr. Wittkopp remarked on Plaintiff's "confusion in general" and noted that Plaintiff reported that she could not read because her thinking was too disorganized.

Plaintiff saw Dr. Howard Rosenbaum for a psychiatric evaluation in February, 2005, after Dr. Wittkopp lost his medical license.  Dr. Rosenbaum diagnosed bipolar disorder, social anxiety disorder, a history of alcohol and substance abuse, and rule out generalized anxiety disorder. Plaintiff told Dr. Rosenbaum that during a manic period the previous December and January she had slept less, begun exercising, and had made plans to start a home-based business selling jewelry.  She also reported depression and isolation, and told Dr. Rosenbaum that she could not see a way to get better and often wished to die.  Dr. Rosenbaum adjusted Plaintiff's medications and referred Plaintiff to psychotherapy, which Plaintiff began in March, 2005.

Dr. Rosenbaum again adjusted Plaintiff's medications in April, 2005, after Plaintiff reported that she was depressed and had been weeping on a daily basis.  During a psychotherapy session in June, 2005, Plaintiff reported depression and talked about suicide, but denied that she planned to kill herself.  She reported that she stayed in her home for three weeks at a time, and described symptoms that were consistent with panic and agoraphobia.  During a session in September, 2005, Plaintiff again reported that she was depressed and had suicidal thoughts.  She also said that she was drinking two or three glasses of wine at night.  Dr. Rosembaum continued

to adjust Plaintiff's medications in an attempt to address Plaintiff's continuing depression and memory problems.

Plaintiff began seeing a new psychotherapist in October, 2005, and began seeing Scott Haynes, N.P., for her psychiatric medications the following December. N.P. Haynes diagnosed Plaintiff with bipolar disorder, alcohol abuse and a remote history of cannabis abuse. He observed that Plaintiff appeared to be entering another hypomanic phase and adjusted her medication. After Plaintiff had returned from visiting her son in Texas later in the month, Plaintiff's counselor noted that Plaintiff was in a hypomanic phase. Plaintiff then stopped attending psychotherapy sessions.

In a visit with N.P. Haynes on February 15, 2006, Plaintiff reported mood swings, increased depression, irregular sleep patterns, and frequent thoughts of suicide. She told N.P. Haynes that depression kept her from trying to return to work, develop her business plan, or exercise. During an interview in April, 2006, Plaintiff appeared anxious and reported that her friend, Keith, had tried to commit suicide and had been involuntarily admitted to a care facility.

Plaintiff was seen at a clinic for chest pain in March and April, 2006. An EKG showed some abnormality, and Dr. Suzanne Hall, a cardiologist, recommended lifestyle changes that included dieting, exercising, and smoking cessation. Blood work showed elevated liver functions, and an ultrasound showed a slightly enlarged liver and other abnormalities.

Dr. Gary Ericson evaluated Plaintiff on May 10, 2006. He noted that Plaintiff reported that she was drinking very heavily and taking large amounts of acetaminophen and aspirin for her headaches. Dr. Ericson thought Plaintiff's elevated liver functions were probably caused by Plaintiff's alcohol and acetaminophen use, but recommended tests to rule out hepatitis and other

possible causes.  He opined that, given Plaintiff's indifference to dying, it would be difficult to change her behavior.

Tests that Dr. Ericson ordered were negative for hepatitis and congenital disorders.  Dr. Ericson advised Plaintiff to stop taking Excedrin and acetaminophen for her headaches, and to consult a pharmacist for an alternative to these medications.  He also urged Plaintiff to reduce her alcohol consumption.

Plaintiff complained of jaw and clavicle pain in visits to other doctors in May and June, 2006.  A laryngoscopy performed by Dr. Eitan Esmer on June 5, 2006, showed severe laryngopharyngeal reflux, and Dr. Esmer prescribed Nexium.

In a visit to N.P. Haynes in June, 2006, Plaintiff reported that she was experiencing symptoms consistent with manic episodes.  She reported going for days without sleep and spending excessively.  Plaintiff said that she had given up her hopes of obtaining employment and was applying for Social Security benefits.  N.P. Haynes discontinued Plaintiff's Wellbutrin prescription and added Cymbalta.

In November, 2006, Plaintiff complained of symptoms of carpal tunnel syndrome.  She was referred for an orthopedic consultation.

Dr. Kara Kassay, who had been Plaintiff's primary care physician since January, 2001, completed a questionnaire on February 13, 2007, concerning Plaintiff's symptoms and limitations.  Dr. Kassay noted that Plaintiff had a bipolar disorder characterized by "rapid cycling" that caused Plaintiff to make "inappropriate decisions," and had carpal tunnel syndrome, mild spina bifida, back pains and spasms, migraines, and numbness in her hands and arms.  Dr. Kassay opined that Plaintiff could stand/walk for no more than one hour during an 8 hour work day, and could sit for 8 hours but would need to stand and move around for 2 or three

FINDINGS AND RECOMMENDATION - 7

minutes hourly.  She thought that Plaintiff could lift up to 10 pounds frequently, could

occasionally lift up to 20 pounds, and could never lift more than 20 pounds.  Dr. Kassay based

these limitations on Plaintiff's congenital spine condition and carpal tunnel syndrome.  She

opined that Plaintiff's symptoms would increase in a competitive work environment, that pain

and fatigue would interfere with Plaintiff's ability to pay attention and concentrate, and that

Plaintiff would need to take 10-15 minute breaks 8 times at unpredictable intervals during an 8

hour work day.  Dr. Kassay opined that Plaintiff's impairments would cause her to miss work

more than three times per month.  In a follow-up letter dated March 23, 2007, Dr. Kassay stated

that Plaintiff's spina bifida and scoliosis caused chronic back pain that prevented Plaintiff from

standing for long periods of time, and that no cause had been found for the bone pain of which

Plaintiff complained.  She also noted that carpal tunnel surgery performed in February, 2007 had

improved the condition of Plaintiff's right wrist, and that Plaintiff was to undergo carpal tunnel

surgery on her left wrist in April, 2007.

On May 23, 2007, Plaintiff told N.P. Haynes that she had stopped taking prescribed

estrogen because she felt that she was being coerced into having a mammogram because she was

taking that medication.  She said that she did not care if she had breast cancer, and that she was

troubled because her best friend, Keith, told her repeatedly, and in detail, of his plans for

committing suicide.  She said that she was drinking one or two glasses of wine every evening,

and referred to herself as a "wino."  Plaintiff reported that she often worked on her Ebay project

throughout the night, and went to sleep in the late morning.

During a visit on August 15, 2007, Plaintiff told N.P. Haynes that Cymbalta seemed to

exacerbate her frequent mood swings, but that she thought that the increased energy and

decreased depression that she experienced with the medication offset that side effect.  She said

FINDINGS AND RECOMMENDATION - 8

that her friend Keith's repeatedly stated intention to kill himself contributed to her depression. On October 10, 2007, Plaintiff again saw N.P. Haynes, based upon her request for an emergency appointment.  Plaintiff reported that her depression had worsened, and her Cymbalta prescription was increased beyond the dosage recommended in FDA guidelines.

In his notes of a visit on January 2, 2008, N.P. Haynes indicated that Plaintiff's mood and outlook had improved with her friend Keith's receipt of Social Security benefits, which had made him less depressed.

On April 30, 2008, Plaintiff told N.P. Haynes that she was doing poorly, and was increasingly depressed and isolated because of problems with her relationship with Keith and her son.  On July 9, 2008, Plaintiff reported that she had reduced the amount of Cymbalta she was taking, and that her condition had not worsened as a result.

During a visit on September 10, 2008, Plaintiff reported increased suicidal ideation, and said she going for extended periods of time without sleep.  N.P. Haynes thought that Plaintiff was not at high risk of harming herself, and continued her medications as previously prescribed.

Plaintiff began seeing Rebekah Trochmann, a new primary care physician, in September, 2008.  Plaintiff told Dr. Trochmann that she experienced ongoing peripheral neuropathy with numbness in her feet and toes and swelling in her legs, migraine headaches, and worsening chronic back pain associated with her spina bifida and scoliosis.  X-rays that Dr. Trochmann ordered showed moderate lumbar spondylosis with narrowing of the intervertebral disk spaces at L4-L5 and L5-S1 and bony spurring with mild facet hypertrophy.

During a visit on October 22, 2008, Plaintiff told N.P. Haynes that she had stopped drinking.  N.P. Haynes accepted  Plaintiff's request to taper off of Cymbalta because of Plaintiff's complaints of weight gain.

Following an e-mail quarrel with Plaintiff,  Keith committed suicide in November, 2008. N.P. Haynes prescribed a limited number of Lorazapam to help Plaintiff cope with her anxiety. Plaintiff subsequently reported that, though this medication did not lessen her anxiety, it did help her sleep.

In a visit on February 11, 2009, Plaintiff told N.P. Haynes that e-mail and phone calls with friends and family were her only social contacts.  Plaintiff reported that she had thoughts of suicide every day, and had recently experienced a period of little sleep, increased focus on tasks, and overspending.  N.P. Haynes provided a limited prescription of Lorazapam and told Plaintiff to take it if she stayed awake for more than 24 hours at a time.

On February 13, 2009, Plaintiff saw Karen Flowers, M.D., because of pain in her left foot.  An X-ray showed extensive degenerative changes in the first metatarsophalangeal joint. Plaintiff had surgery to replace that joint on April 9, 2009, and subsequently reported that this had lessened the pain in her foot.

On a disability questionnaire that she completed on April 8, 2009, Dr. Trochmann listed Plaintiff's diagnoses as including bipolar disorder, degenerative joint/disc disease, chronic pain syndrome (involving many sites), and carpal tunnel syndrome.  Dr. Trochmann reported that Plaintiff's symptoms included back pain that was caused by spina bifida, scoliosis and degenerative spondylosis; numbness and tingling in her feet and toes; weakness and pain in her hands; chronic headaches; and neck pain.  In her physical capabilities assessment, she reported that Plaintiff could sit for 3 hours and walk and stand for less than 1 hour during an 8-hour work day, could lift 20 pounds occasionally and 10 pounds frequently, would need to take unscheduled breaks throughout the day, and would miss more than 3 days per month because of

FINDINGS AND RECOMMENDATION - 10

her impairments.  Dr. Trochmann opined that Plaintiff was incapable of tolerating even "low

stress" work.

In a psychiatric/psychological impairment questionnaire that he completed on April 29,

2009, N.P. Haynes noted that Plaintiff's diagnoses included a major depressive disorder, a

generalized anxiety disorder, social phobia, and polysubstance abuse in partial remission.  He

assessed her then current GAF score as 52, and opined that it had been as low as 35 during the

preceding year.  N.P. Haynes reported that Plaintiff had chronic suicidal ideation and rarely left

home.  He opined that Plaintiff was markedly limited in her ability to handle detailed

instructions, to maintain concentration and attention, to work within a schedule and maintain

regular attendance, to complete a workweek without interruption from her psychological

symptoms, to sustain an ordinary routine, to work in proximity to others, to interact

appropriately with the general public, to adapt to changes in the work setting, and to travel to

unfamiliar places or use public transportation.  He assessed Plaintiff as moderately limited in a

number of work-related areas, including the ability to remember work-like procedures, to

understand one and two step instructions, to make work-related decisions, to maintain socially

appropriate behavior, to be aware of hazards, and to set realistic goals or make plans

independently.  N.P. Haynes reported that Plaintiff experienced episodes of decompensation in

work-like situations, and opined that even a low-stress work environment would exacerbate

Plaintiff's stress and suicidal ideation.  He further opined that Plaintiff would miss work at least

3 days a month because of her impairments.

After the first of the two hearings before the ALJ, the Agency referred Plaintiff to Cheryl

Brischetto, Ph.D., for a neuropsychological evaluation.  Dr. Brischetto reviewed Plaintiff's

medical records, and interviewed and tested Plaintiff on July 28, 2009.  She diagnosed Plaintiff

with Bipolar II disorder, provisionally diagnosed PTSD, and diagnosed alcohol abuse in partial remission and polysubstance abuse in full, sustained remission. Dr. Brischetto assessed Plaintiff with moderate limitations in the ability to remember and carry out complex tasks; to make judgments on complex work-related decisions; and to interact appropriately with co-workers, supervisors, and the general public. She also found that, because of her mood changes, Plaintiff had moderate to marked limitation in the ability to respond to changes in a routine work setting. Dr. Brischetto found that Plaintiff had no limitations in the ability to understand, remember, and carry out simple instructions, or in the ability to make judgments concerning simple work-related decisions.

At the request of the Agency, Dr. Tatsuro Ogisu performed a consultative medical examination on July 29, 2009. Plaintiff told Dr. Ogisu that her hands became weak and cramped with overuse, causing her to drop things. On examination, Dr. Ogisu found that Plaintiff had positive Tinel's signs and slightly decreased strength in her hands. Dr. Ogisu opined that Plaintiff's reported back pain was caused by lumbar spondylosis, and that Plaintiff had minimal residual carpal tunnel syndrome which was symptomatic upon overuse. He characterized Plaintiff's thoracolumbar spondylosis as minimal, and opined that the contributions of this condition and Plaintiff's spina bifida to Plaintiff's pain were questionable. Dr. Ogisu found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could sit for thirty minutes at a time for a total of 6 hours during and 8 hour work-day, and that she could stand and walk 10 minutes at a time for up to 4 hours during an 8 hour work-day.

At the request of Plaintiff's counsel, Jack Litman, Ph.D., performed a psychological evaluation of Plaintiff. Dr. Litman thoroughly reviewed Plaintiff's medical history, including the evaluation performed by Dr. Brischetto and the raw data from the tests she administered, and

administered two additional psychological tests.  Dr. Litman provided his own interpretation of the data from Dr. Brischetto's testing.

In a report dated September 1, 2009, Dr. Litman diagnosed Plaintiff with a cognitive disorder, which he thought might be related to her medications; Bipolar II disorder versus a cyclothymic disorder; PTSD; alcohol and cannabis abuse in sustained, full remission; and a pain disorder.  Based upon his evaluation and review of the medical and testing records, Dr. Litman opined that Plaintiff was "far too brittle and medically unstable to be employed."  He found that Plaintiff's condition was worsening rather than stabilizing, and that it was not responsive to medications.


**<u>Disability Analysis</u>**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

<u>Step Two</u>.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

FINDINGS AND RECOMMENDATION - 13

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## Hearing Testimony

### Plaintiff

Plaintiff testified that she was often depressed, experienced severe shifts in mood and energy because of her Bipolar disorder, was uncomfortable around people and seldom left her home, experienced significant pain and headaches, slept poorly and at irregular hours, often needed to lie down during the day because of back pain, and had significant problems with memory and concentration.  She testified that she did not clean her house, and was inattentive to personal hygiene unless she was required to go out.  Her testimony was consistent with the description of symptoms, impairments, and employment history reflected in the medical records summarized above.

### Vocational Expert

The VE testified that Plaintiff had past relevant work experience as a branch operations manager, president of a financial institution, and accountant.

The ALJ posed a vocational hypothetical describing an individual who was capable of light work; could use foot controls occasionally or frequently and was occasionally able to engage in other postural activities; and was limited to routine, repetitive work with little public contact and only brief interactions with supervisors and co-workers.  In response, the VE testified that the described individual could not perform any of Plaintiff's past relevant work, but could work as a small products assembler or as a cannery worker.  The VE testified that an individual who missed work 4 to 8 hours per week, or who was impaired in the manner described by Dr. Litman could not sustain work, and that moderate limitations in grasping, reaching, handling, and fingering would rule out all light work.

## **ALJ's Decision**

The ALJ found that Plaintiff had last met the requirements for insured status on December 31, 2008.

At the first step of the disability assessment process, he found that Plaintiff had not engaged in substantial gainful activity after she applied for benefits.

At the second step, the ALJ found that Plaintiff's obesity, lumbar pain, major depressive disorder, general anxiety disorder, and polysubstance abuse in partial remission were "severe" impairments.

At the third step of his assessment, the ALJ found that, alone or in combination, these impairments did not meet or equal a presumptively disabling listed impairment set out in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to the fourth step, the ALJ evaluated Plaintiff's residual functional capacity (RFC). He found that Plaintiff retained the functional capacity to perform less than the full range of light work, could use foot controls occasionally to frequently, could occasionally engage in other postural maneuvers, and could perform only light, repetitive work with brief social interaction with co-workers and supervisors. In evaluating Plaintiff's RFC, the ALJ found that Plaintiff's testimony concerning the severity of her symptoms and limitations was not credible to the extent that it was inconsistent with these conclusions.

At the fourth step, the ALJ found that Plaintiff could not perform her past relevant work.

At the fifth step, based upon the testimony of the VE, the ALJ found that Plaintiff could work as a small products assembler or a cannery worker. Based upon that finding, he concluded that Plaintiff was not disabled within the meaning of the Act.

.

**Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

**Discussion**

Plaintiff contends that the ALJ erred in failing to fully credit the opinions of her treating and certain of her examining physicians, in finding that she was not wholly credible, and in rejecting the statements of a lay witness.

FINDINGS AND RECOMMENDATION - 17

1. **Evaluation of Opinions of Plaintiff's Treating Physicians and Examining Physicians**

The ALJ here gave only limited weight to the opinions of Plaintiff's treating physicians and of Dr. Litman, the examining psychologist who evaluated Plaintiff at the request of her counsel.  He gave greater weight to the opinions of the consultative examiners who evaluated Plaintiff at the request of the Agency.

**Evaluating Medical Opinions**

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific and legitimate" reasons, which are supported by substantial evidence in the record, for rejecting the opinion of a treating physician that is contradicted by the opinion of another physician.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must support the rejection of an examining physician's opinion that is contradicted by another physician with specific and legitimate reasons that are supported by substantial evidence in the record.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).  A non-examining physician's opinion "cannot by itself constitute substantial evidence that justifies rejection of the opinion of either an examining physician or a treating physician."  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

**Analysis**

A. **Dr. Kara Kassay**

Dr. Kassay was Plaintiff's treating physician from 2001 through some time in 2007.  Dr. Kassay completed a questionnaire in February, 2007, in which she described Plaintiff's physical problems and opined that Plaintiff could walk or stand only 1 hour during an 8 hour work-day, was markedly limited in her ability to grasp and twist and moderately impaired in her ability to perform fine manipulation and to reach, would need to take unscheduled 10 to 15 minute breaks 8 times during a work-day, and would miss more than 3 days of work per month because of her impairments.

The ALJ gave "limited weight" to Dr. Kassay's opinions on the grounds that she "relied quite heavily" on Plaintiff's "reports of symptoms and limitations" in forming her assessment of Plaintiff's functional capacity.  He asserted that Dr. Kassay "reported that there were no laboratory or diagnostic results that supported the claimant's reported impairments."

These reasons are not accurate, and do not provide the kind of "specific and legitimate" bases, supported by substantial evidence in the record, required to discount the opinion of a treating doctor that is contradicted by other medical opinion.  Dr. Kassay's comment concerning the absence of laboratory or diagnostic tests referred specifically to Plaintiff's reports of memory loss, and did not relate to any of the other severe functional limitations to which this treating physician referred.  Dr. Kassay had ample opportunities to objectively observe and assess Plaintiff's physical impairments during a 6 year period that she treated her, and the ALJ's assertion that she merely accepted and reported Plaintiff's own subjective description of her symptoms is not supported by a careful review of Dr. Kassay's treating record.  Those records

clearly indicate that Dr. Kassay reviewed the reports of other doctors who treated and evaluated

Plaintiff, and based her opinions at least in part on her own examinations and observations.

In his response to Plaintiff's opening memorandum, the Commissioner acknowledges

that Dr. Kassay "reviewed records of diagnostic tests from other medical sources, and treated the

claimant for six years," and concedes that "the ALJ should not have assigned Dr. Kassay's

opinions limited weight on the ground of a lack of diagnostic results to support them."  He asks

that the action be remanded to provide the ALJ an opportunity to re-evaluate Dr. Kassay's

opinion and "re-evaluate the opinions of all medical sources and the lay witnesses . . . ."

When an ALJ provides inadequate reasons for rejecting the opinion of a treating

physician, that opinion is credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir.

1995).  A reviewing court then has discretion to remand the action for further proceedings or for

a finding of disability and an award of benefits.  See, e.g, Stone v. Heckler, 761 F.2d 530, 533

(9th Cir. 1985).  Whether an action is remanded for an award of benefits or for further

proceedings depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d

1172, 1179 (9th Cir. 2000).  A reviewing court should credit the evidence and remand for a

finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient

reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a

determination of disability can be made; and 3) it is clear from the record that the ALJ would be

required to find the claimant disabled if the evidence in question were credited.  Smolen v.

Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the Commissioner appropriately concedes that the ALJ did not provide legally

adequate reasons for rejecting Dr. Kassay's opinions.  As will be briefly discussed below, he

FINDINGS AND RECOMMENDATION - 20

likewise did not provide adequate reasons for rejecting the opinions of other treating and examining physicians.

There is no question that an ALJ who accepted Dr. Kassay's opinions would have been required to find that Plaintiff was disabled.  This leaves only the question whether outstanding issues must be resolved before a determination of disability is made.  The Commissioner contends that remand for further proceedings is appropriate because "it is unclear whether Plaintiff has transferable skills," and a finding of disability is inappropriate if she has such skills. This argument fails.  Transferability "means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs."  SSR 82-41.   As Plaintiff correctly notes, Plaintiff's ability to perform skilled or semiskilled jobs is not relevant here, because the ALJ specifically found that she is limited "to unskilled work with no public contact."

Based upon the ALJ's acknowledged failure to provide legally sufficient reasons for rejecting the opinions of Plaintiff's treating physician, this action should be remanded for an award of benefits.  Though this conclusion makes it unnecessary to do so, I will briefly address the ALJ's evaluation of other medical opinions, as well as the other issues Plaintiff raises here, in order to create a full record for review.

B. **Dr. Rebekah Trochmann**

In April, 2009, Dr. Trochmann, another of Plaintiff's treating physicians, completed a questionnaire concerning Plaintiff's functional capacities.  Dr. Trochmann noted that Plaintiff's symptoms included pain caused by spina bifida, scoliosis, and degenerative spondylosis;

numbness and tingling in her feet and toes; weakness and pain in her hands related to carpal tunnel syndrome and surgeries; chronic headaches; and neck pain.  Dr. Trochmann opined that Plaintiff would need to take unscheduled breaks throughout the work-day, and would miss more than three days of work per month because of her impairments.  The VE testified that such limitations would preclude competitive employment.

The ALJ rejected these opinions on the grounds that Dr. Trochmann had only a brief treatment history with Plaintiff, had merely relied on Plaintiff's subjective reporting of her symptoms, and had opined on mental impairments that were beyond her expertise.  These are not legally sufficient reasons.  Though Dr. Trochmann saw Plaintiff only a few times, she had more contact with Plaintiff than did Dr. Ogisu, an examining physician who saw Plaintiff only once, and whose opinion the ALJ gave "significant weight."  Dr. Trochmann had repeated contacts with Plaintiff, examined her, and had the opportunity to review her medical records, treatments notes, and X-rays.  There is no support for the ALJ's assertion that Dr. Trochmann merely relied on Plaintiff's subjective reports of her own symptoms, or for his assertion that Dr. Trochmann opined as to mental issues that were outside the scope of her expertise.  In response to a question regarding Plaintiff's symptoms, Dr. Trochmann simply noted that Plaintiff suffered from bipolar symptoms and referenced an unidentified  "psych form."  She mentioned Plaintiff's mental impairments only in response to a question regarding emotional factors that affected Plaintiff, and did not purport to diagnose or opine as to the severity of Plaintiff's mental impairments. Plaintiff's bipolar disorder diagnosis is referenced repeatedly throughout the medical record, and there is no basis for concluding that Dr. Trochmann did not have the expertise to assess evidence concerning that disorder or to accurately note the emotional factors that are frequently referred to in the record as well.  From her evaluation, it is clear that Dr. Trochmann based her opinions

concerning Plaintiff's functional limitations on Plaintiff's well documented physical impairments, and did not opine as to impairments that were outside her expertise. The ALJ's contrary suggestion is neither accurate nor a sufficient basis for rejecting Dr. Trochmann's opinion.

C. **N.P. Haynes**

After seeing Plaintiff regularly, and prescribing psychiatric medications for her for several years, N.P. Haynes completed a questionnaire in April, 2009, concerning Plaintiff's mental impairments. As noted above, N.P. Haynes indicated that Plaintiff was markedly limited in a number of work-related areas, stated that Plaintiff could not perform even low stress work without exacerbation of her symptoms, and opined that Plaintiff's impairments would cause her to miss work at least 3 days a month–an absentee rate that the VE testified would preclude employment.

The ALJ rejected these opinions on the grounds that the marked limitations N.P. Haynes reported were inconsistent with Haynes' assignment of a GAF score of 52, because Haynes was not a physician or Ph.D., and because his opinion as to Plaintiff's disability encroached on the ALJ's area of responsibility. Though N.P. Haynes was not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513, who could establish the existence of an impairment, he was qualified to offer an opinion as to the severity of Plaintiff's impairments based upon the knowledge he gained from his treatment of Plaintiff, in his professional capacity, over a substantial period of time. See SSR 06-03. N.P. Haynes had evaluated Plaintiff many times during the years that he prescribed her psychiatric medications, and his opinion concerning how her impairments affected her ability to function was within his area of competence. See id..

FINDINGS AND RECOMMENDATION - 23

N.P. Haynes was a lay witness, albeit one who was arguably much better situated than the typical lay witness to objectively observe and report the effects of Plaintiff's impairments, and the ALJ was required to provide reasons that were "germane" for rejecting his opinions. E.g., Bruce v. Astrue, 557 F.3d 1113, 1115-16 (9th Cir. 2009). The ALJ's observations that N.P. Haynes was not a Ph.D. or M.D. is not "germane" under the circumstances of this action, given that there is no question that he had the expertise necessary to prescribe psychiatric medications based upon his observations and expertise. The ALJ's implication that N.P. Haynes' assessment of a GAF score of 52 is inconsistent with his opinion that Plaintiff was markedly impaired in many areas likewise is not "germane." N.P. Haynes had also assessed GAF scores as low as 35, and he assessed the score of 52 at a time when Plaintiff seldom left her apartment or engaged in the kinds of activities that were noted to exacerbate her symptoms. N.P. Haynes' conclusion that Plaintiff could not perform even low stress work without an exacerbation of symptoms is fully supported by substantial evidence in the medical record.

D. **Dr. Litman**

As noted above, Dr. Litman performed a psychological evaluation of Plaintiff at the request of Plaintiff's attorney. Dr. Litman reviewed Plaintiff's extensive medical records, including the report that Dr. Brischetto had prepared based upon an examination performed at the request of the Agency. He also administered tests, and reviewed the testing data upon which Dr. Brischetto had based some of her conclusions. Based upon his examination of Plaintiff and this material, Dr. Litman concluded that Plaintiff was "far too brittle and medically unstable to be employed."

As noted above, Dr. Brischetto opined that Plaintiff was somewhat less impaired than indicated in Dr. Litman's report. The ALJ gave Dr. Brishcetto's report significant weight on the

grounds that it was consistent with the medical records and with Plaintiff's activities of daily living.  He rejected Dr. Litman's opinion as inconsistent with the medical record and Plaintiff's activities of daily living, and as an encroachment on the ALJ's area of responsibility.

The ALJ did not provide "specific and legitimate" reasons, supported by substantial evidence in the medical record, for rejecting Dr. Litman's opinion in favor of Dr. Brischetto's. Notably, these examining psychologists largely reviewed the same records, including the tests administered by Dr. Brischetto, and came to conclusions that were not so different.  Dr. Brishchetto opined that Plaintiff would be moderately to markedly impaired in her ability to work in a routine environment, and both examining psychologists noted that Plaintiff would have significant difficulty performing in a work environment.   Dr. Litman's assessment was based upon a thorough review of the medical record, an extensive clinical interview, and a careful analysis of objective testing results.  His opinion as to the severity of Plaintiff's impairments was wholly consistent with substantial evidence in the medical record, with the opinions of Plaintiff's treating physicians and N.P. Haynes, and with most of the evidence in the record concerning Plaintiff's activities of daily living.   Under these circumstances, the ALJ's reasons for rejecting Dr. Litman's opinions were insufficient.

E. **Dr. Ogisu**

Dr. Ogisu, who examined Plaintiff at the request of the Agency, opined that Plaintiff could stand and walk for 10 minutes at a time for up to 4 hours during an 8 hour work-day, and could sit for 30 minutes at a time for up to 6 hours a day.  The ALJ gave significant weight to Dr. Ogisu's opinion as to Plaintiff's ability to stand and walk.  Though the opinion was inconsistent with the opinions of Plaintiff's treating physicians, he asserted that it was consistent with the medical record.

Plaintiff contends that the ALJ failed to provide the necessary support for accepting Dr. Ogisu's opinion while rejecting the opinions of her treating physicians. I agree. Dr. Ogisu cited no tests or other evidence supporting his opinion as to Plaintiff's ability to stand and walk. That opinion was inconsistent with substantial evidence in the medical record, including the evaluations of treating physicians who had observed, examined, and evaluated Plaintiff on many more occasions.

2. **Assessment of Plaintiff's Credibilty**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is not supported by objective medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc)).* If a claimant produces the requisite medical evidence and there is no evidence of malingering, an ALJ must provide specific, clear and convincing reasons, supported by substantial evidence, to support a determination that the claimant was not wholly credible. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p. If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

An ALJ must examine the entire record and consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7.  An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living.  Thomas, 278 F.3d at 958-59 (9th Cir. 2002).

Plaintiff here testified that she was often depressed, experienced severe shifts in mood and energy because of her Bipolar disorder, was uncomfortable around people and seldom left her home, experienced significant pain and headaches, slept poorly and at irregular hours, often needed to lie down during the day because of back pain, and had significant problems with memory and concentration.  She testified that she did not clean her house, and was inattentive to personal hygiene unless she was required to go out.

Plaintiff produced medical evidence of impairments that would clearly cause some symptoms, and there was no evidence of malingering.  The ALJ was therefore required to support his finding that she was not wholly credible with specific, clear and convincing reasons, which were supported by substantial evidence in the record.

The ALJ found that Plaintiff was not wholly credible because she was able to be goal and future oriented and was motivated to maintain her businesses, her migraines and headaches were controlled by medication, she did not take medication for her back pain, and she was not motivated to seek employment because she received money from a trust fund.

Plaintiff contends that these reasons do not provide the required support for the ALJ's credibility determination.  I agree.  Though Plaintiff may have thought about and attempted to plan for the future, her sporadic, intermittent ability to work on her evidently unprofitable home businesses was not inconsistent with her testimony concerning the severity of her symptoms. Plaintiff's efforts to work on her businesses appeared to correspond to the rise and fall of her

energy with Bipolar episodes, and there is no evidence that Plaintiff's efforts on those enterprises reflected an ability to carry out the activities required by competitive employment.  The ALJ's assertion that Plaintiff did not have significant back pain because she did not take medications for it is not convincing: Plaintiff's history of spina bifida and scoliosis is repeatedly cited as the source of significant back pain in the records of treating and examining physicians.  Plaintiff's testimony that she did not take pain medications because she feared addiction is fully consistent with the medical record, which shows that Plaintiff repeatedly raised this concern with medical providers, and Plaintiff's reluctance to take these medications is fully consistent with her history of polysubstance abuse in remission.  Any motivation Plaintiff had to obtain disability benefits because income from her trust fund was projected to cease in a few years does not provide a legitimate basis for discounting Plaintiff's credibility: as Plaintiff correctly notes, every claimant who applies for benefits seeks pecuniary gain, and no claimant could be found to be credible if the motivation to obtain benefits in itself indicated a lack of credibility.

3. **Credibilty of Lay Witness Evidence**

Keith Faigen, one of Plaintiff's friends, submitted a "Third Party Function Report" describing Plaintiff as severely impaired.  The ALJ found that this report was not credible because this witness had a personal relationship with Plaintiff and lacked the medical expertise to offer an objective functional analysis.

As noted above, an ALJ must provide "germane" reasons for rejecting lay witness evidence.  E.g, Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  These reasons do not meet that requirement.  Friends are often in the best position to observe a claimant's symptoms and daily activities, and a close relationship is not a proper basis for discounting lay witness testimony.  E.g., Bruce v. Astrue, 557 F.3d 1113 (9th Cir. 2009).  A lay witness's lack of medical expertise

likewise is not a proper basis for rejecting lay witness evidence.  A lay witness is, by definition, not a medical expert.  If the lack of medical expertise were a proper basis for discounting lay witness testimony, such testimony would never be relevant.

### Conclusion

A Judgment should be entered REVERSING the decision of the Commissioner and REMANDING this action to the Agency for a finding of disability and an award of benefits.

### Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due June 25, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 7th day of June, 2012.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION - 29